**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

KATE BRAVERMAN,

       Plaintiff,

vs.                                              No. CIV 11-0829 JB/WDS

THE STATE OF NEW MEXICO,
THE HONORABLE SARAH SINGLETON,
JAMES HALL, and
LPL FINANCIAL CORPORATION,

       Defendants.

**MEMORANDUM OPINION**[1]

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Temporary Restraining Order and Brief in Support, filed September 16, 2011 (Doc. 2)("Motion for TRO"). The Court held a hearing on September 26, 2011. The primary issues are whether the Court should enter an order: (i) enjoining New Mexico's First Judicial District Court and Defendants the Honorable Judge Sarah Singleton and Special Master James Hall from taking an action that would transfer Plaintiff Kate Braverman's assets to Alan H. Goldstein; (ii) enjoining Defendant LPL Financial Corporation ("LPL Financial") from transferring any of Braverman's assets to Goldstein; and (iii) directing LPL Financial to immediately return to Braverman's name and to her unfettered control, all assets in the Secondary IRA LPL account number XXXX-2868. For the reasons stated on the record at the hearing, and because (i) Braverman has not met the heavy showing required to secure a disfavored temporary restraining order, (ii) the Court must abstain from interfering with ongoing

---

[1]Consistent with footnote 1 on page 1 of the Court's Order, filed October 6, 2011 (Doc. 14), denying the Plaintiff's Motion for a Temporary Restraining Order, filed September 16, 2011 (Doc. 2), the Court now enters this opinion fully detailing its rationale for this decision.

state-court judicial proceedings that involve important state interests and provide a forum in which Braverman may raise her claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12111-12213 ("ADA"), (iii) the Anti-Injunction Act, 28 U.S.C. § 2283, also prohibits the Court from providing the relief Braverman requests, (iv) judicial immunity protects Judge Singleton and Special Master Hall, and (v) Judge Singleton and Special Master Hall may not be sued in their individual capacities, the Court will deny her request for a temporary restraining order ("TRO").

## FACTUAL BACKGROUND

Braverman petitioned the State of New Mexico for divorce from her husband, Goldstein. See Emergency Complaint For Injunctive Relief ¶¶ 2, 11, at 1, 3, filed September 16, 2011 (Doc. 1)("Complaint"). Judge Singleton is the judge presiding over Braverman v. Goldstein, Case No. D-0101-DM-2009-01009, pending in the First Judicial District, Santa Fe County, State of New Mexico ("Divorce Proceeding"). See Complaint ¶ 2, at 1. Former Judge Hall is the appointed Special Master in the divorce proceeding. See Complaint ¶ 3, at 2. Braverman "suffers from moderate bi-polar disorder." Complaint ¶ 8, at 3. Braverman has significant assets that she maintained in a separate account with LPL Financial. See Complaint ¶¶ 11, 14, at 3-4. As part of the divorce proceeding, Judge Singleton found that Braverman should have "unfettered control" over $1.5 million in assets and that the remaining $800,000 be put in a "secondary IRA" controlled by Judge Singleton and Special Master Hall. Complaint ¶ 16, at 4.

Braverman asserts that the LPL Financial account is located outside of New Mexico. See Complaint ¶ 18, at 5. Braverman alleges that, on October 12, 2010, Judge Singleton granted Goldstein a veto power over transfer, investment, or expenditures of the secondary IRA and that Goldstein unreasonably exercised that power to veto several reasonable investment plans that

Braverman proposed.  See Complaint ¶¶ 21, 23, at 5-6.  During the divorce proceeding, Judge Singleton denied Braverman's requests for an order of protection from Goldstein, an order directing disclosure of Goldstein's address, and an order removing Goldstein's attorney, Richard S. Lees, from the case.  See Complaint ¶¶ 33-34, 37, at 9-10.  Braverman asserts that Judge Singleton denied her motions because of her disability.  See Complaint ¶¶ 33, 37, at 9-10.  Braverman asked that Special Master Hall permit her reasonable accommodation in her second deposition, requesting that "her attorney-in-fact be permitted to attend to provide the support and protection she needed to cope with her disability during the deposition."  Complaint ¶ 40, at 11.  Special Master Hall denied the request.  See Complaint ¶ 40, at 11.  In April 2011, Special Master Hall issued Proposed Findings of Fact and Conclusions of Law, and included many findings and conclusions regarding Braverman's bi-polar disorder.  See Complaint ¶ 44, at 12.  Braverman asserts that Hall singled her out and treated her differently because of her disability.  See Complaint ¶ 44, at 12.  On July 25, 2011, Judge Singleton adopted the entirety of the Proposed Findings of Fact and Conclusions of Law.  See Complaint ¶ 45, at 12.  Braverman asserts that Judge Singleton would not have made such findings but for her disability.  See Complaint ¶ 45, at 12.

Braverman contends that New Mexico, through its agents, Judge Singleton and Special Master Hall, unlawfully discriminated against Braverman on account of her bi-polar disorder, which is a disability that the ADA, treats as a covered disability against which an employer may not discriminate.  See Complaint ¶ 46, at 13.  Braverman contends that the Defendants have: (i) denied her the right to be free from deprivations of property and liberty without due process of law on account of her disability; (ii) violated her procedural and substantive due-process rights to her property; and (iii) violated her procedural and substantive due-process rights to equal access to the

courts.  See Complaint ¶¶ 51-59, at 13-15.

## **PROCEDURAL BACKGROUND**

On September 16, 2011, Braverman filed her Complaint.  Braverman contends that the Defendants discriminated against her on the basis of her bi-polar disorder in contravention of her rights under the ADA, and under the Fifth and Fourteenth Amendments to the United States Constitution.  See Complaint ¶¶ 51-59, at 13-15.

Braverman moves the Court, pursuant to rule 65(b) of the Federal Rules of Civil Procedure, to issue a TRO: (i) prohibiting the State of New Mexico, acting through its agents Judge Singleton and Special Master Hall, from taking any action that would have the effect of transferring Braverman's assets to Goldstein, including, without limitation, the entry of any order or decree purporting to implement Special Master Report No. 6 or Order Adopting Special Master Report No. 6[2] entered in the divorce proceeding; (ii) prohibiting LPL Financial from transferring any of Braverman's assets to Goldstein or otherwise without Braverman's prior consent; and (iii) affirmatively directing LPL to immediately return to Braverman's name and unfettered control all presently held in the secondary IRA, LPL Financial account number XXXX-2868.  See Motion for TRO at 1.  Braverman maintains that she is entitled to prospective injunctive relief against New Mexico and its agents to halt violations of her rights to equal treatment under Title II of the ADA. See Motion for TRO ¶ 2, at 2 (citing 42 U.S.C. § 12202; Tennessee v. Lane, 541 U.S. 509, 518

---

[2]In the divorce proceeding, Special Master Hall issued Special Master Report No. 6 (Recommended Findings of Fact and Conclusions of Law Following Evidentiary Hearing), dated April 18, 2011 (Plaintiff's Ex. 3)("Findings and Conclusions").  Special Master Hall's Findings and Conclusions determined what was marital or separate property, the equitable division of such property, and that Braverman owed an equalization payment of $307,672.00 to Goldstein.  See Findings and Conclusions at 21-23.  On July 25, 2011, Judge Singleton issued an order adopting Special Master Hall's report in its entirety.  See Complaint ¶ 45, at 12.

(2004)).  Braverman asserts that none of the Defendants are entitled to immunity for their alleged

discrimination.  See Motion for TRO ¶ 3, at 2.

Braverman avers that injunctive relief is appropriate and necessary, because the Defendants

are "about to transfer Plaintiff's property in such a manner that she will be unable to recover it" and

that the transfer is the result of unlawful discrimination.  Motion for TRO ¶ 4, at 2-3.  Braverman

asserts that, unless the Court grants the TRO, she will suffer irreparable harm, because the property

will be irretrievably transferred out of the State of New Mexico and in a manner that will make it

impossible for her to recover it.  See Motion for TRO ¶ 5, at 3.  Braverman also contends that, if the

Defendants effect a transfer of her property, then she will suffer an additional $100,000.00 in tax

liability.  See Motion for TRO ¶ 6, at 3-4.  Braverman further asserts that if the Court does not enter

the TRO, the public will lose confidence in the judicial system.  See Motion for TRO ¶ 7, at 4.

Braverman alleges that the issuance of a TRO will not injure any of the Defendants or Goldstein

because the Defendants have no stake in the outcome of these proceedings and a Court order will

maintain the status quo.  See Motion for TRO ¶ 8, at 4.  Finally, Braverman alleges that she is likely

to succeed on the merits of her claim for the reasons set out in her Complaint.  See Motion for TRO

¶ 9, at 4.

The Court held a hearing on September 26, 2011.  At the hearing, Braverman asserted that

her case is unusual and that laws are not supposed to operate the way they have in this case.  See

Transcript of Hearing at 13:19-14:6 (September 26, 2011)(Boyle)("Tr.").[3]  Braverman commented

that she was "dismayed . . . that the state has chosen to oppose the request" and that she "has sought

_____

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

the assistance . . . of the Attorney General prior to this . . . and now they oppose."[4]  Braverman stated

that she "certainly has the right to appeal and will appeal" the state court's division of her assets, but

"that's a separate set of issues."  Tr. at 14:20-15:4 (Court, Boyle).  Braverman argued that the claims

before the Court are her allegations of discrimination, and that the Court has unique jurisdiction to

understand and apply the ADA.  See Tr. at 15:5-8 (Boyle).  Braverman stated that the only claim she

has asserted arises under the ADA.  See Tr. at 15:12-16 (Court, Boyle).  When asked by the Court

what relief Braverman was seeking for her claims, Braverman responded that "it is prospective

injunctive relief only."  Tr. at 16:14-23 (Court, Boyle).  Braverman asserts that she seeks to enjoin

the "transfer of money to Mr. Goldstein" and to prevent LPL from effecting any such transfer.  Tr.

at 17:2-6 (Boyle).

        The Court asked several questions about the irreparable harm that Braverman would suffer.

See Tr. at 17:7-10 (Court).  Braverman responded that, if the money is transferred out of state to

Goldstein, she has "no real recourse to get it back, even if she's able to overturn any of the decisions

[in] the appellate courts," and that she will be "hit by the federal and state tax penalty, in essence,

of $107,000 and change."  Tr. at 17:11-22 (Boyle).  Braverman asserted that, in the divorce

proceeding Goldstein's attorney, Mr. Lees, distributed a nude photograph of her, and that Judge

Singleton and Special Master Hall participated in further distributing the photograph during the

proceeding.  See Tr. at 18:22-19:3 (Boyle).  Braverman argues that the only explanation for the

behavior of "the district court and Mr. [Lees] and others involved in this conspiracy" is that "they

misunderstood Ms. Braverman's bipolar disorder and believed that they had to somehow protect her

---

        [4]Although originally represented by private counsel, at the hearing, Assistant Attorney
General Scott Fuqua entered his appearance on behalf of the State of New Mexico, Judge Singleton
and Special Master Hall.

or dictate to her how she could use her money and how she could conduct her life." Tr. at 19:4-10 (Boyle).  Braverman asserts "that's the kind of the discrimination that the ADA is intended to remedy." Tr. at 19:10-11 (Boyle).  Braverman also drew the Court's attention to Special Master Hall's findings and conclusions, where he makes multiple references to the fact that Braverman suffers from bi-polar disorder and that she occasionally acts in a hostile manner towards her family. See Tr. at 20:4-21:11 (Boyle).  Braverman asserted that she satisfies each of the requirements for a TRO. See Tr. at 23:15-24:4 (Boyle).

When asked whether the federal courts can provide a remedy for the ADA claim or whether the state court of appeals should address the ADA on appeal, Braverman argued that the ADA specifically allows for injunctive relief and relied on Tennessee v. Lane. See Tr. at 26:13-27:10 (Court, Boyle).  In response to questions about the application of the Anti-Injunction Act, Braverman argued that the ADA falls within the expressly authorized exception. See Tr. at 28:18-30:17 (Court, Boyle).  Braverman also asserted, in reliance on Tennessee v. Lane, that she can sue individuals under Title II of the ADA, and not just state entities. See Tr. at 32:9-20 (Court, Boyle). Finally, Braverman argued that the United States Court of Appeals for the Tenth Circuit's holding in Brown ex rel. Brown v. Day, 555 F.3d 882 (10th Cir. 2009), answered the Court's concerns about abstention. See Tr. at 32:21-33:15 (Boyle).

The State Defendants[5] asserted that their strongest arguments in opposition to the Motion for TRO were Younger v. Harris, 401 U.S. 37 (1971), abstention, the Anti-Injunction Act, and judicial immunity, and that any one of those arguments could independently defeat Braverman's motion.

---

[5]The State of New Mexico, Judge Singleton, and Special Master Hall are collectively referred to as the "State Defendants."

See Tr. at 34:7-12 (Court, Fuqua).  The State Defendants argued that nothing in the ADA bars the application of the Anti-Injunction Act and that Congress did not say anything about whether the Anti-Injunction Act would apply to prevent a federal court from issuing an injunction for a state court judge in an ongoing proceeding.  See Tr. at 35:4-36:1 (Fuqua).  The State Defendants characterized Braverman's argument as a "blanket prohibition" on the ability of the state court to continue with the case pending in front of them.  Tr. at 37:7-9 (Fuqua).  Additionally, the State Defendants asserted that the Younger abstention doctrine should apply, because the state proceeding is an ongoing, domestic relations case, in which the state has a strong interest, and Braverman has adequate remedies before the Court of Appeals of New Mexico if she believes the state district court violated her rights.  See Tr. at 37:10-25 (Fuqua).

On the issue whether the TRO standard was met, the State Defendants argued that Braverman has an adequate remedy at law, because she could bring a lawsuit against her ex-husband.  See Tr. at 39:1-22 (Fuqua).  Finally, the State Defendants argued that Eleventh Amendment immunity is different from judicial immunity and that Tennessee v. Lane dealt only with abrogation of the Eleventh Amendment.  See Tr. at 39:23-40:6 (Fuqua).  They asserted that the case Braverman cited, Guttman v. Khalsa, 446 F.3d 1027, 1033 (10th Cir. 2006), upholds the application of judicial immunity while finding that Eleventh Amendment immunity is abrogated.  See Tr. at 40:6-15 (Fuqua).  They contend that judicial immunity is an absolute bar.  See Tr. at 40:15-16 (Fuqua).

Goldstein's counsel was also at the hearing.[6]  Goldstein argued that the divorce proceeding's

---

[6]Goldstein filed a Motion to Intervene on September 23, 2011 (Doc. 8).  The Court heard argument from Braverman and Goldstein on the Motion to Intervene at the hearing.  See Tr. at 5:11-8:15 (Court, Boyle, Lees).  The State Defendants had no position on the motion.  See Tr. at 8:19-20

findings of fact, which reference Braverman's bi-polar disorder, are not more than findings of fact. See Tr. at 43:11-15 (Lees). Goldstein also asserts that Braverman introduced the issue of her disability and asked the state court to give her special consideration because of her bi-polar disorder. See Tr. at 43:11-19 (Lees). Goldstein further alleges that Braverman received the special consideration for which she asked, because Special Master Hall declined to award Goldstein spousal support. See Tr. at 43:19-44:6 (Lees).

LPL Financial's counsel was also present at the hearing. As of the hearing, LPL Financial had yet to receive service of process, but attended the hearing in response to a letter the Court directed Braverman send. See Tr. at 3:25-4:3 (Ross).[7] Although LPL Financial is a Defendant in this case, Braverman does not allege that it discriminated against her or deprived her of any rights. See Motion for TRO at 1-5. LPL Financial asserted that its interest in the hearing was limited and that its "only interest is to obtain clear instructions, either jointly from the parties or via court order, as to how we are to dispose and/or transfer these investment accounts." Tr. at 41:24-42:7 (Crown).

Responding to the State Defendants' argument, Braverman asserted that whether she could proceed in state court is not the end of the inquiry and cited to Ankenbrandt v. Richards, 504 U.S. 689 (1992), for the proposition that, where a domestic relationship has no bearing on the underlying torts alleged, abstention was inappropriate. See Tr. at 45:14-19 (Boyle). Braverman further asserted

_____

(Fuqua). LPL Financial also had no position on the motion. See Tr. at 8:22-23 (Crown). Although the Court did not decide the Motion to Intervene, the Court permitted Goldstein to present his position on the TRO at the hearing. See Tr. at 9:15-20 (Court).

[7]On September 20, 2011, the Court entered a Minute Order directing Braverman to immediately serve a copy of the Notice of Motion Hearing regarding the Motion for Temporary Restraining Order to the Defendants and/or their counsel. See Minute Order, filed September 20, 2011 (Doc. 4).

that, like in Ankenbrandt v. Richards, abstention is inappropriate in this case, because the case

before the Court brings a claim separate from the divorce proceeding that is based on the ADA, a

law unique to federal jurisdiction.  See Tr. at 45:23-46:8 (Boyle).

### LAW REGARDING REQUESTS FOR TEMPORARY RESTRAINING ORDER

The requirements for the issuance of a temporary restraining order are similar to those for

the issuance of a preliminary injunction.  Injunctive relief is considered an "extraordinary remedy,"

and the movant must demonstrate a "clear and unequivocal right" to have a request granted.  Greater

Yellowstone Coal. v. Flowers, 321 F.3d 1250 (10th Cir. 2003).  In determining whether to grant

injunctive relief, courts consider the following four factors: (i) whether the moving party will suffer

irreparable injury unless the injunction issues; (ii) whether there is a substantial likelihood that the

moving party will eventually prevail on the merits; (iii) whether the threatened injury to the moving

party outweighs whatever damage the proposed injunction may cause the opposing party; and

(iv) whether the injunction, if issued, would not be adverse to the public interest.  See Resolution

Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992)(citation omitted); Fed. Lands Legal

Consortium ex rel. Robart Estate v. United States, 195 F.3d 1190, 1194 (10th Cir. 1999).  If a

movant can show that the first, third, and fourth factors "tip strongly in his favor, the test is

modified," and the moving party "may meet the requirement for showing success on the merits by

showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to

make the issue ripe for litigation and deserving of more deliberate investigation." Okla. ex rel. OK

Tax Comm'n v. Int'l Registration Plan, Inc., 455 F.3d 1107, 1113 (10th Cir. 2006).  The Tenth

Circuit has stated that "in cases where the requested preliminary injunction alters the status quo . .

. the movant will ordinarily find it difficult to meet its heavy burden of showing that the four factors,

on balance, weigh heavily and compellingly in its favor, without showing a substantial likelihood of success on the merits." Herrera v. Santa Fe Pub. Schs., No. 11-0422, 2011 WL 2433050, at *4 (D.N.M. May 20, 2011)(Browning, J.)(quoting Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)).

### RELEVANT LAW REGARDING ABSOLUTE IMMUNITY

"Judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." Stump v. Sparkman, 435 U.S. 349, 355-56 (1978). That same immunity continues even if the judge's "exercise of authority is flawed by the commission of grave procedural errors." Stump v. Sparkman, 435 U.S. at 359.

The Supreme Court of the United States has emphasized that a judge's immunity from civil liability "is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial acts, i.e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Mireles v. Waco, 502 U.S. 9, 11-12 (1991)(citations omitted). The Supreme Court has also held that absolute judicial immunity was not affected or abolished "by § 1983, which makes liable 'every person' who under color of law deprives another person of his civil rights." Pierson v. Ray, 386 U.S. 547, 554 (1967), overruled in part on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982).

The Tenth Circuit has also recognized that "officials in administrative hearings can claim the absolute immunity that flows to judicial officers if they are acting in a quasi-judicial fashion." Guttman v. Khalsa, 446 F.3d 1027, 1033 (10th Cir. 2006)(citing Butz v. Economou, 438 U.S. 478,

514 (1978)).  For an official at an administrative hearing to enjoy absolute immunity, "'(a) the officials' functions must be similar to those involved in the judicial process, (b) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct.'"  Guttman v. Khalsa, 446 F.3d at 1033 (quoting Horwitz v. State Bd. of Med. Examiners of State of Colo., 822 F.2d 1508, 1513 (10th Cir. 1987)).

In Guttman v. Khalsa, a doctor who suffered from depression and post-traumatic stress disorder had appeared before the Impaired Physicians Committee of the New Mexico Board of Medical Examiners to respond to a series of complaints about his professional conduct.  See 446 F.3d at 1030.  The Committee in Guttman v. Khalsa issued a "Notice of Contemplated Action and Order of Summary Suspension" of the doctor's medical license based on alleged mental illness and lying to the Committee.  446 F.3d at 1030.  The New Mexico Board of Medical Examiners then held a hearing, during which one of the defendants acted as Administrative Prosecutor.  See Guttman v. Khalsa 446 F.3d at 1030.  The New Mexico Board of Medical Examiners in Guttman v. Khalsa revoked the doctor's medical license pursuant to its statutory authority to do so.  See 446 F.3d at 1030.

The doctor in Guttman v. Khalsa appealed the decision to the Seventh Judicial District of New Mexico.  See 446 F.3d at 1030.  The Seventh Judicial District of New Mexico denied the appeal, and the doctor then appealed to the Court of Appeals of New Mexico.  See Guttman v. Khalsa, 446 F.3d at 1030.  After the Court of Appeals of New Mexico affirmed, the doctor filed a petition for certiorari with the Supreme Court of New Mexico.  See Guttman v. Khalsa, 446 F.3d at 1030.  Before the Supreme Court of New Mexico could act on the petition, the doctor filed a

-12-

lawsuit in federal court, alleging, among other things, violations of his constitutional rights.  See Guttman v. Khalsa, 446 F.3d at 1030.

The Tenth Circuit in Guttman v. Khalsa held that the Rooker–Feldman doctrine did not bar the doctor's federal lawsuit, because the state-court lawsuit was not final.  See 446 F.3d at 1032.[8] The Tenth Circuit found, however, that the Administrative Prosecutor and the individual who presided over the three-day hearing in front of the New Mexico Board of Medical Examiners enjoyed absolute immunity.  See Guttman v. Khalsa, 446 F.3d at 1032.  The basis for the hearing officer's immunity in Guttman v. Khalsa was that he had served a quasi-judicial function.  See 446 F.3d at 1032.

The Tenth Circuit in Guttman v. Khalsa also relied on an earlier case:  Horwitz v. State Bd. of Med. Examiners of State of Colo., 822 F.2d 1508.  In Horwitz v. State Bd. of Med. Examiners of State of Colo., the Tenth Circuit concluded that members of the State Board of Medical Examiners for the State of Colorado enjoyed absolute immunity for actions it took in filing a formal complaint against a doctor, and in temporarily suspending his right to practice medicine pending investigations and hearings.  See 822 F.2d at 1510, 1515.  The Tenth Circuit in Horwitz v. State Bd. of Med. Examiners of State of Colo. reasoned that the defendant Board members were performing adjudicatory and prosecutorial functions.  See 822 F.2d at 1515.  The Tenth Circuit in Horwitz v. State Bd. of Med. Examiners of State of Colo. also noted:

There exists a strong need to insure that individual Board members perform their

---

[8]The Rooker-Feldman doctrine derives from two Supreme Court cases, Rooker v. Fid. Trust Co., 263 U.S. 413 (1923) and Dist. of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983).  The Tenth Circuit has recognized that the "Rooker-Feldman doctrine prohibits federal suits that amount to appeals of state-court judgments."  Bolden v. City of Topeka, Kan., 441 F.3d 1129, 1142-43 (10th Cir. 2006)(citations omitted).

> functions for the public good without harassment or intimidation. There exist adequate due process safeguards under Colorado law to protect against unconstitutional conduct without reliance upon private damages lawsuits. It is important to insulate Board members from political influences in meeting their adjudicatory responsibilities in the adversarial setting involving licensure to practice medicine.  Public policy requires that officials serving in such capacities be exempt from personal liability.

822 F.2d at 1515.  Finally, the Tenth Circuit pointed out the Board members' functions, observing

that Board members

> serve in the prosecutorial role in that they, among other things, initiate complaints, start hearings, make investigations, take evidence, and issue subpoenas. They also serve in the adjudicative role, as judges. Thus, the Board duties are "functionally comparable" to a court of law.  And we are reminded that, with respect to immunity, we must include all acts of the official performing statutory duties as having "[m]ore or less connection with the general matters committed by law" to his station.

822 F.2d at 1515.

Although certain officers enjoy immunity from suit for acts taken in a quasi-judicial setting,

the Supreme Court has held that court reporters do not enjoy such immunity. Rejecting a court

reporter's claim of absolute immunity, the Supreme Court stated: "We are also unpersuaded by the

contention that our functional approach to immunity . . . requires that absolute immunity be extended

to court reporters because they are part of the judicial function." Antoine v. Byers & Anderson, Inc.,

508 U.S. 429, 435 (1993). Rather, in the Supreme Court's view:

> The doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability.  Accordingly, the "touchstone" for the doctrine's applicability has been "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." [Burns v. Reed,] 500 U.S. [478,] 500 [(1991)] (Scalia, J., concurring in judgment in part and dissenting in part). When judicial immunity is extended to officials other than judges, it is because their judgments are "functional[ly] comparab[le]" to those of judges -- that is, because they, too, "exercise a discretionary judgment" as a part of their function.  Imbler v. Pachtman, 424 U.S. [409] at 423, n. 20 [(1976) ].

<u>Antoine v. Byers & Anderson, Inc.</u>, 508 U.S. at 435-36 (footnote omitted)(final two alterations in original).

In light of this understanding of judicial immunity, the Supreme Court found that the function that court reporters perform is not one that would lead to a grant of immunity.  See <u>Antoine v. Byers & Anderson, Inc.</u>, 508 U.S. at 436.  The Supreme Court reasoned that court reporters "are afforded no discretion" in carrying out their duty and that they are "not absolutely immune because their duties are ministerial, not discretionary in nature."  <u>Antoine v. Byers & Anderson, Inc.</u>, 508 U.S. at 436 (citations omitted)(internal quotation marks omitted).

The Court has also drawn distinctions between when a person is acting in a judicial role, such that they are entitled to quasi-judicial immunity,[9] and when a person in a quasi-judicial setting plays a merely ministerial role.  See <u>Duprey v. Twelfth Judicial Dist. Court</u>, 760 F.Supp.2d 1180, 1204 (D.N.M. 2009)(Browning, J.).  In <u>Duprey v. Twelfth Judicial Dist. Court</u>, the Court found that the state defendant who acted as chairperson of the judicial grievance board was entitled to absolute immunity, because his function was similar to that of an administrative law judge in a quasi-judicial setting.  See 760 F.Supp.2d at 1204.  The Court found that the director of human resources for the New Mexico Administrative Office of the Courts was not entitled to absolute immunity, because her role was ministerial and mechanical.  See 760 F.Supp.2d at 1204.  In analyzing each defendant's function, the Court focused on participation in the deliberative process and the exercise of independent judgment.  See <u>Duprey v. Twelfth Judicial Dist. Court</u>, 760 F.Supp.2d at 1205.  The Court determined that, because the human resources director played a ministerial role and did not

---

[9]Quasi-judicial immunity affords "non-judicial officers the same absolute immunity enjoyed by judges when a claim is based on duties performed in furtherance fo the judicial process." <u>Henshaw v. Bliss</u>, 421 F.App'x 870, 871 (10th Cir. 2011).

act at the direction of a judge, she was not entitled to judicial immunity.  See Duprey v. Twelfth

Judicial Dist. Court, 760 F.Supp.2d at 1208 ("An individual whose job at a judicial proceeding is

to run a tape recorder is not one who needs to be able to act according to her own convictions.").

## LAW REGARDING THE ANTI-INJUNCTION ACT

"The Anti-Injunction Act provides that a federal court 'may not grant an injunction to stay

proceedings in a State court' except in three circumstances: 'as expressly authorized by Act of

Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.'"

Weyerhaeuser Co. v. Wyatt, 505 F.3d 1104, 1107 (10th Cir. 2007)(citing 28 U.S.C. § 2283).

> [T]he Supreme Court . . . explained the purpose of the [Anti-Injunction Act]. The law
> "is a necessary concomitant of the Framers' decision to authorize, and Congress'
> decision to implement, a dual system of federal and state courts."  By prohibiting
> "frequent federal court intervention" in state court proceedings, the [Anti-Injunction
> Act] "forestalls ... 'friction between the state and federal courts.'"

Weyerhaeuser Co. v. Wyatt, 505 F.3d at 1108 (citations omitted).  "[T]he [Anti-Injunction] Act is

an absolute prohibition against any injunction of any state-court proceedings, unless the injunction

falls within one of the three specifically defined exceptions in the Act."  Vendo Co. v. Lektro-Vend

Corp., 433 U.S. 623, 630 (1977).  "[A]ny doubts as to the propriety of a federal injunction against

state court proceedings should be resolved in favor of permitting the state courts to proceed in an

orderly fashion to finally determine the controversy."  Vendo Co. v. Lektro-Vend Corp., 433 U.S.

at 630 (internal quotation marks omitted).

The Anti-Injunction Act applies to prohibit a federal court from enjoining the court or a party

in a state-court proceeding from prosecuting the suit, complying with, or enforcing state-court

orders.  The prohibition of § 2283 cannot be evaded by addressing the order to the parties or

prohibiting use of the results of a completed state proceeding.  See Atl. Coast Line R.R. Co. v. Bhd.

of Locomotive Eng'rs, 398 U.S. 281, 287 (1970).  "Proceedings in state courts should normally be

allowed to continue unimpaired by intervention of the lower federal courts, with relief from error,

if any, through the state appellate courts and ultimately to the [Supreme] Court [of the United

States]."  Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. at 287.   And the

Supreme Court has long held that the term "proceedings" in state court

> is comprehensive.  It includes all steps taken or which may be taken in the state court
> or by its officers from the institution to the close of the final process.  It applies to
> appellate as well as to original proceedings; and is independent of the doctrine of res
> judicata.  It applies alike to actions by the court and by its ministerial officers;
> applies not only to an execution issued on a judgment, but to any proceeding
> supplemental or ancillary taken with a view to making the suit or judgment effective.
> The prohibition is applicable whether such supplementary or ancillary proceeding
> is taken in the court which rendered the judgment or in some other.  And it governs
> a privy to the state court proceeding . . . as well as the parties of record.  Thus, the
> prohibition applies whatever the nature of the proceeding, unless the case presents
> facts which bring it within one of the recognized exceptions [to the Anti-Injunction
> Act].

Hill v. Martin, 296 U.S. 393, 403 (1935)(footnotes omitted).

## LAW REGARDING MANDATORY ABSTENTION

Under the abstention doctrine that the Supreme Court articulated in Younger v. Harris,

"federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such

as injunctions of important state proceedings or declaratory judgments regarding constitutional

issues in those proceedings" when the state forum provides an adequate avenue for relief.  Weitzel

v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt

v. Kelly, 164 F.3d 1296, 1302 (10th Cir.1999)). This refusal to exercise federal jurisdiction arises

from a desire to "avoid undue interference with states' conduct of their own affairs."  J.B. ex rel.

Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999)(quoting Seneca-Cayuga Tribe v. Oklahoma,

874 F.2d 709, 711 (10th Cir. 1989)).

For Younger abstention to be appropriate, three elements must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982)); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001).  When all of the elements mandating abstention clearly exist in the record, courts may, and should, address application of the Younger abstention doctrine sua sponte.  See Bellotti v. Baird, 428 U.S. 132, 143 n. 10 (1976)(stating that "abstention may be raised by the court sua sponte"); Crown Point I, LLC v. Intermountain Rural Elec. Ass'n, 319 F.3d 1211, 1214 (10th Cir. 2003)("The applicability of Younger abstention was not raised by the parties below.  However, the issue arose after a motions panel of this circuit determined, sua sponte, that the District Court was required to abstain from granting the plaintiff's request for injunctive relief based on the principles articulated in Younger . . . ."); Morrow v. Winslow, 94 F.3d 1386, 1390-91 & n. 3 (10th Cir. 1996)(raising and applying Younger abstention doctrine sua sponte, holding that parties need not raise the Younger abstention doctrine to preserve its applicability, and reversing and remanding for entry of an order of dismissal because the district court failed to sua sponte apply the doctrine). "Younger abstention is not discretionary once the [three] conditions are met, absent extraordinary circumstances that render a state court unable to give state litigants a full and fair hearing on their federal claims."  Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)(citation omitted).  See Taylor v. Jaquez, 126 F.3d 1294, 1296 (10th Cir.1997)(holding that, because "'application of the Younger doctrine is absolute . . . when a case meets the Younger criteria,' there is no discretion for the district court to exercise.").  The Tenth Circuit has thus held that, when

<u>Younger</u> abstention principles control a case, and "the circumstances . . . counsel abstention," the district court must "abstain and . . . dismiss [the federal plaintiff's] case without prejudice." <u>Morrow v. Winslow</u>, 94 F.3d at 1398 (determining <u>sua</u> <u>sponte</u> that abstention and dismissal were required, vacating the district court's judgment that denied injunctive and declaratory relief on the merits, and remanding for issuance of an order of dismissal).   <u>See</u> <u>Younger v. Harris</u>, 401 U.S. at 43 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings); <u>Chapman v. Oklahoma</u>, 472 F.3d 747, 750 (10th Cir. 2006)(affirming dismissal of federal case because its consideration <u>Younger</u> abstention principles bar the court's consideration, but remanding for district court to enter order reflecting dismissal without prejudice instead of dismissal with prejudice).

## <u>RELEVANT LAW REGARDING TITLE II OF THE ADA</u>

Title II of the ADA, 42 U.S.C. §§ 12131-12165, commands that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of such services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The Tenth Circuit requires that a plaintiff prove three factors to establish a claim under Title II: (i) that he or she is a qualified individual with a disability; (ii) that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or the public entity otherwise discriminated against the plaintiff; and (iii) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.  <u>See</u> <u>Gohier v. Enright</u>, 186 F.3d 1216, 1219 (10th Cir. 1999)(explaining that this general standard, which tracks the language of the statute, is "plainly correct").  Although a plaintiff may claim intentional discrimination, the Tenth Circuit has not yet articulated the essential

elements of a claim of intentional discrimination under Title II of the ADA or detailed what a plaintiff must plead at a minimum to establish such a claim.  See Tyler v. City of Manhattan, 118 F.3d 1400, 1405 (10th Cir. 1997)(Jenkins, J., dissenting); Young v. City of Claremore, O.K., 411 F.Supp.2d 1295, 1314 (N.D. Okla. 2005).

The Supreme Court in Tennessee v. Lane, 541 U.S. 509 (2004), held that Title II of the ADA, as applied to cases implicating the fundamental right of access to the courts, validly abrogates state sovereign immunity.  See 541 U.S. at 531 ("[W]e find that Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services . . . .").  "The [Supreme] Court found that, although the conduct that was the basis for the suit was not a direct violation of the Constitution, Title II, in the context of the suit, was valid prophylactic legislation that prevents and deters unconstitutional conduct." Guttman v. Khalsa, 446 F.3d at 1035.  If a district court determines that a plaintiff states a valid claim under Title II, it must then determine whether Congress abrogated sovereign immunity as applied to the class of conduct at issue in the case.  See Guttman v. Khalsa, 446 F.3d at 1036 (citing United States v. Georgia, 546 U.S. 151, 156-57 (2006)).  In Guttman v. Khalsa, the Tenth Circuit reversed the district court's determination that sovereign immunity protected New Mexico from all suits under Title II of the ADA, applying the reasoning of Tennessee v. Lane.  See Guttman v. Khalsa, 446 F.3d at 1036.  The Tenth Circuit affirmed, however, the district court's decision that a hearing officer and administrative prosecutor were entitled to absolute immunity.  See Guttman v. Khalsa, 446 F.3d at 1033-34 ("Guttman does not allege that the Board or Parsons was without jurisdiction -- he merely claims that Parsons should have recused himself.  Parsons is hence entitled to absolute immunity in this suit.").

## ANALYSIS

Braverman does not meet the Tenth Circuit's requirements for injunctive relief, because she cannot show that she faces irreparable harm, that she is likely to succeed on the merits of her claim, that her injury outweighs any harm to other parties, or that granting the TRO would be in the public interest. The Court will likely need to abstain, under Younger v. Harris, from enjoining an ongoing state proceeding where the state has an important interest and provides an adequate opportunity in the state court proceeding to raise the federal claims. Moreover, the Anti-Injunction Act likely prohibits the Court from enjoining a state court where the claims do not fall into one of three exceptions. Title II of the ADA does not appear to expressly authorize an injunction against state court proceedings. Finally, judicial immunity likely protects Judge Singleton and Special Master Hall, and, even if judicial immunity does not shield them, Title II of the ADA does not appear to permit suit against state officials in their individual capacity.

**I.      BRAVERMAN HAS NOT MET THE STRINGENT REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER.**

Braverman's Complaint seeks only injunctive relief -- the same relief that she seeks in her Motion for TRO. See Complaint at 15-16; Motion for TRO at 5; Tr. at 16:14-23 (Court, Boyle)(stating that the requested relief is injunctive, not just for the TRO, but for the entire case). Her motion thus falls into the category of injunctions that the Tenth Circuit disfavors, because a TRO would grant all the relief that she could be awarded at the end of trial. See Flood v. ClearOne Commc'ns, Inc., 618 F.3d 1110, 1117 n.1 (10th Cir. 2010). Accordingly, Braverman bears a high burden to establish the likelihood of success on the merits and with regard to the balance of harms. See Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009)(stating that disfavored injunctions "require strong showings of the likelihood of success on the merits and the balance of

harms.").  Braverman cannot meet this high standard.

## II.   BRAVERMAN HAS NOT SHOWN THAT SHE WILL SUFFER IRREPARABLE HARM UNLESS THE INJUNCTION ISSUES.

Braverman alleges that she will suffer irreparable harm because the Defendants are about to transfer her property in such a way that she will be unable to recover it.  See Motion for TRO ¶ 4, at 3.  Braverman alleges that her property will be transferred to an out-of-state party, that she is suffering from investment losses, and that she will suffer an additional $100,000.00 in tax liabilities.

"An irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." Greater Yellowstone Coal v. Flowers, 321 F.3d at 1258 (quoting Adams v. Freedom Forge Corp., 204 F.3d 475, 484-85 (3d Cir. 2000)).  While Braverman asserts that it will be impossible to recover her property, she does not explain why the Court of Appeals of New Mexico could not address many of the issues that she presents, because that court will have jurisdiction over Goldstein, as the other party to the divorce proceeding.  Additionally, the Court would have jurisdiction over Goldstein, if he is allowed to intervene in this matter.  Although Braverman does not request monetary damages here, Braverman failed to establish that a suit for monetary damages would be an insufficient remedy.  Braverman also alleges that she will lose approximately $100,000.00 in tax liability, if the Court does not grant the TRO.  See Motion for TRO ¶ 6, at 4.  Braverman failed, however, to inform the Court how it reached the figure $100,000.00 or how this tax liability will be assessed. Furthermore, Braverman has not established that a suit for monetary damages for any tax liability would be an insufficient remedy.  Accordingly, the Court finds that Braverman does not face an irreparable injury.

-22-

**III.     BRAVERMAN HAS NOT SHOWN A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.**

Because the Court will likely abstain, there will likely be no federal action in this Court on which Braverman is likely to succeed on the merits.  The Court cannot, of course, predict how the state-court appellate proceedings will turn out, because nothing except for the documents Braverman filed, are in the record.  Under <u>Younger v. Harris</u>, it is unlikely that Braverman can secure any relief in this Court, because a request for injunctive relief under these circumstances is not only unlikely to succeed, it is likely prohibited.  There is also substantial doubt whether Braverman has stated, or can state, a federal cause of action because of absolute judicial immunity.  The Court must dismiss the Complaint that requests the relief.

**A.     THE COURT WILL LIKELY NEED TO ABSTAIN FROM HEARING THIS CASE.**

The Framers of the Constitution of the United States designed a system in which

> there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

<u>Younger v. Harris</u>, 401 U.S. at 44.  Federal courts should not interfere with ongoing state court proceedings "by granting equitable relief such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" when the state forum provides an adequate avenue for relief.  <u>Weitzel v. Div. of Occupational & Prof'l Licensing</u>, 240 F.3d 871, 875 (10th Cir. 2001)(citations omitted).

Braverman asserts that the Court should apply the "coercive/remedial distinction" that the Tenth Circuit applied in <u>Brown ex rel. Brown v. Day</u>, 555 F.3d 882.  <u>See</u> Tr. at 32:21-33:15 (Boyle). Braverman further asserts that abstention is inappropriate in this case, because the claims before the

Court are separate from the divorce proceeding and based on the ADA, a law unique to federal jurisdiction.  See Tr. at 45:23-46:8 (Boyle)(citing Ankenbrandt v. Richards, 504 U.S. 689 (1992)). The State Defendants counter that, because there is an ongoing state proceeding, an important state interest, and an adequate remedy in the state court, the Court must follow Younger v. Harris and abstain.  See Tr. at 37:10-38:6 (Fuqua).

The distinction drawn between coercive and remedial proceedings in Brown ex rel. Brown v. Day is inapplicable to the case before the Court.  In Brown ex rel. Brown v. Day, the Tenth Circuit recognized that different tests for determining Younger abstention apply to civil judicial and civil administrative proceedings:

> Similarly, in an attempt to cabin the Younger doctrine, the [Supreme] Court has suggested that Younger abstention is limited to situations where the civil proceedings in question (1) are enforcement proceedings or (2) involve certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions . . . Although that analysis also suggests there should not have been Younger abstention in this case, we will use the dichotomy between remedial and coercive administrative proceedings set forth in [Ohio Civil Rights Comm'n v.] Dayton Christian Schs., 477 U.S. 619, 627 n.2 (1986), as the touchstone for determining whether the administrative proceeding is the type of proceeding that merits Younger abstention. . . .

Brown ex rel. Brown v. Day, 555 F.3d at 888 n.5 (emphasis added).  The Tenth Circuit explained that it would use "the dichotomy between remedial and coercive administrative proceedings. . . as the touchstone for determining whether [an] administrative proceeding" merits abstention under Younger v. Harris because its sister courts tend to use that articulation and because the doctrine in Younger v. Harris originated in "concerns that federal plaintiffs might stymie state coercive proceedings by trying to bring suit in the federal courts."   555 F.3d at 889 n.5 (emphasis added). The Tenth Circuit noted, however, that while this test is "close kin to the distinctions drawn in the civil Younger cases" it only applies to administrative proceedings.  Brown ex rel. Brown v. Day, 555

-24-

F.3d at 889 n.5. The test for civil proceedings is whether the civil proceedings in question "(1) are

enforcement proceedings or (2) 'involv[e] certain orders that are uniquely in furtherance of the state

courts' ability to perform their judicial functions.'" Brown ex rel. Brown v. Day, 555 F.3d at 889

n.5 (citing New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 368

(1989))(emphasis added).[10]  This test follows from the  Supreme Court's holding in Pennzoil Co.

v. Texaco Inc., a civil proceeding case, that Younger abstention should apply, "not only when the

pending state proceedings are criminal, but also when certain civil proceedings are pending, if the

State's interests in the proceeding are so important that exercise of the federal judicial power would

disregard the comity between the States and the National Government."  481 U.S. at 11.

      This case involves an issue that is uniquely in furtherance of the state court's ability to

_____

[10]Although the Court previously held in Martinez v. Martinez, No. 09-0281, 2010 WL 1608884 (D.N.M. Mar. 30, 2010)(Browning, J.), that a divorce proceeding initiated by a private party is not "a state-initiated civil-enforcement proceeding that the Tenth Circuit would consider 'coercive" or the type of ongoing proceeding that requires abstention, that decision did not take fully into account the Supreme Court's decision in Pennzoil Co. v. Texaco Inc., 481 U.S. 1, 11 (1987). 2010 WL 1608884 at *16.  The Court's opinion also relied on Brown ex rel. Brown v. Day for the coercive/remedial distinction, but did not fully recognize that the coercive/remedial test was designed to determine Younger v. Harris' application to civil administrative proceedings and not to civil judicial proceedings.  See Martinez v. Martinez, 2010 WL 1608884, at *16.  The Court's opinion in Martinez v. Martinez involved the Magistrate Judge's Proposed Findings of Fact and Conclusions of Law in a case brought by a pro se plaintiff.  Accordingly, the Court did not have the benefit of robust briefing on the issue, as only one party addressed abstention under Younger v. Harris.  Nevertheless, the Court continues to believe that its holding in Martinez v. Martinez -- dismissing all claims under judicial immunity or for failure to state a claim -- is correct.  The incomplete analysis of Younger v. Harris and its progeny did not affect the ultimate result on abstention, because the Court found that there was not an ongoing proceeding for the purposes of Younger abstention.  See Martinez v. Martinez, 2010 WL 1608884, at *16 ("That the jurisdiction of the state court is in some sense continuing should not justify considering the state-court proceeding 'ongoing' for the purposes of Younger abstention.").  The Court found that the state proceeding was not ongoing, because a final decree had already been entered, and the parties to the state proceeding had chosen not to pursue their state court judicial remedies.  See Martinez v. Martinez, 2010 WL 1608884, at *15-17.

perform their judicial functions, because Braverman seeks to enjoin any order or decree implementing the state court's decision in the divorce proceeding as reflected in the Order Adopting Special Master Report No. 6.  See Motion for TRO at 1.  Furthermore, Braverman alleges that the state court proceeding itself is unlawful, which the Tenth Circuit noted in Brown ex rel. Brown v. Day weighs in favor of abstention.  See 555 F.3d at 899.  Pennzoil Co.  v. Texaco Inc. speaks directly to this case when the Supreme Court states: "There is little difference between the State's interest in forcing persons to transfer property in response to a court's judgment and in forcing persons to respond to the court's process on pain of contempt."  481 U.S. at 13.  The Supreme Court continued to elaborate on this rule:

> Not only would federal injunctions in such cases interfere with the execution of state judgments, but they would do so on grounds that challenge the very process by which those judgments were obtained.  So long as those challenges relate to pending state proceedings, proper respect for the ability of state courts to resolve federal questions presented in state-court litigation mandates that the federal court stay its hand.

Pennzoil Co. v. Texaco Inc., 481 U.S. at 14.  Braverman asks the Court to enjoin the entry of a decree or order to enforce the transfer of assets that the state court determined was appropriate, the same kind of relief that the Supreme Court in Pennzoil Co. v. Texaco Inc. found required the federal court to abstain.

The state proceeding is ongoing; at the time of the hearing, the state court had yet to issue its final decree, and Braverman has conceded that she "certainly has the right to appeal and will appeal."  Tr. at 14:20-15:4 (Court, Boyle).  The Supreme Court has held that, where the lawsuit out of which the federal proceeding arises is pending before the state court of appeals, it is ongoing for the purposes of Younger v. Harris abstention.  See  Pennzoil Co. v. Texaco Inc., 481 U.S. at 14 n.13 ("There is at least one pending judicial proceeding in the state courts; the lawsuit out of which

Texaco's constitutional claims arose is now pending before a Texas Court of Appeals in Houston, Texas."). Accord BP Am. Prod. Co. v. Kysar, No. 05-0578, 2010 WL 2541695, at *6 (D.N.M. Apr. 22, 2010)(Browning, J.)(holding that, a case on appeal is ongoing for abstention purposes).

The state has an important interest in enforcing its courts' decisions. See Pennzoil Co. v. Texaco Inc., 481 U.S. at 14. Furthermore, the state has an important interest in divorce proceedings that "belong to the laws of the States and not to the laws of the United States." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. at 12-13 (internal quotations and citations omitted). Accord Vaughan v. Smithson, 883 F.2d 63, 65 (10th Cir. 1989)(stating the rationale for the domestic relations exception: "the states have a strong interest in domestic relations matters . . .[;] such disputes often require ongoing supervision, a task for which the federal courts are not suited . . .[;] and . . . such cases serve no particular federal interest."). The Tenth Circuit has recognized that domestic relations can provide an important state interest in ongoing state proceedings such that the federal courts should abstain under Younger. See Morrow v. Winslow, 94 F.3d at 1397. In Morrow v. Winslow, the ongoing state proceeding involved an adoption, and the state court judge was named as a defendant in the federal proceeding. See 94 F.3d at 1397. The Tenth Circuit stated that "[t]he state, although not a party, obviously has an interest in the orderly conduct of the proceedings in its courts in a manner which protects the interests of the child and the family relationship." Morrow v. Winslow, 94 F.3d at 1397. Similar concerns are present when the state court proceeding involves a divorce; the state court must look to the equities involved and determine how to divide marital assets, while protecting both parties' interests. Braverman asserts that the domestic-relations exception does not give the state an interest, despite the fact that the case involves a state court divorce proceeding, because the domestic relationship has no bearing on the underlying torts

alleged.  See Tr. at 45:23-46:8 (Boyle)(citing Ankenbrandt v. Richards, 504 U.S. 689).[11]   In

Ankenbrandt v. Richards, however, the Supreme Court found that Younger v. Harris abstention was

inappropriate because there was no ongoing state proceeding, and not because of any difference

between the state and federal claims.  See 504 U.S. at 705 ("In this case, there is no allegation by

respondents of any pending state proceedings, and Ankenbrandt contends that such proceedings

ended prior to her filing this suit.  Absent any pending proceeding in state tribunals, therefore,

application by the lower courts of Younger abstention was clearly erroneous.")(emphasis original).

_____

[11]The domestic-relations exception is a judicially created exception to Congress' grant of diversity-based subject-matter jurisdiction to the federal district courts.

> In the more than 100 years since [the Supreme Court] laid the seeds for the development of the domestic relations exception, the lower federal courts have applied it in a variety of circumstances.  Many of these applications go well beyond the circumscribed situations posed by Barber [v. Barber, 62 U.S. 582 (1858)] and its progeny.

Ankenbrandt v. Richards, 504 U.S. at 701.  In 2006, the Supreme Court emphasized that "the exception covers only a narrow range of domestic relations issues . . . . [O]nly divorce, alimony, and child custody decrees remain outside federal jurisdictional bounds."  Marshall v. Marshall, 547 U.S. 293, 307-08 (2006).  The Court, following the Supreme Court's direction in Marshall v. Marshall, recently held that the domestic-relations exception did not apply where the plaintiff asked the Court to re-distribute the marital estate based on claims of fraud.  See Martinez v. Martinez, 2010 WL 1608884, at * 17.  It is not clear whether the domestic relations exception applies to cases that arise under the federal courts' federal-question jurisdiction.  See Johnson v. Rodrigues (Orozco), 226 F.3d 1103, 1111 n.4 (10th Cir. 2000)("Some district courts in the Second Circuit have applied the domestic relations exception in federal question cases, but other Circuits have held that the exception is limited to diversity suits . . . . The parties have not addressed this distinction and we do not feel it advisable or necessary . . . to do so."); Rivers v. Hewitt, No. 11-0439, 2011 WL 1344231, at *2 (D. Colo. Apr. 4, 2011)(Tafoya, J.)("[Supreme Court] language suggests that the domestic relations exception applies to both diversity and federal question jurisdiction.").  In this case, the Court does not apply the domestic relations exception, because the claims before the Court do not directly involve divorce, alimony or custody, but instead allege discrimination in a court proceeding.  See Martinez v. Martinez, 2010 WL 1608884, at *17.  The Court refers to the domestic relations exception in this memorandum opinion and order only to emphasize the importance of the ongoing state proceeding to the State of New Mexico and the unique state interest that exists in divorce proceedings.

The comment that "where, as here, the status of the domestic relationship . . . has no bearing on the underlying torts alleged," Ankenbrandt v. Richards, 504 U.S. at 706, was in reference to abstention under Burford v. Sun Oil Co., 319 U.S. 315 (1943), where abstention in diversity cases is justified by a state's integrated administrative system and unified method of formation of policy, see 319 U.S. at 334. The case before the Court implicates New Mexico's interest in domestic relations, because it seeks to enjoin New Mexico's resolution of the status of the domestic relationship.

Finally, there is an adequate opportunity afforded in the state court proceeding to raise the federal claim. Braverman may argue to the Court of Appeals of New Mexico that is should overturn Judge Singleton's ruling because of ADA violations. Braverman does not assert that she attempted to raise her ADA claims in the state court proceeding. "[W]hen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." Pennzoil Co. v. Texaco, Inc., 481 U.S. at 15. Braverman's only argument about bringing her ADA claims before the Court of Appeals of New Mexico is "that's a separate set of issues. That's about appealing things like the court's division of property and the court's decision on some important other issues of that nature." Tr. at 14:24-15:4 (Boyle). Braverman does not argue that the Court of Appeals of New Mexico would provide an inadequate remedy, but argues that the issue whether the state Court of Appeals provides an adequate forum is irrelevant to the Court's TRO determination. The Court finds no "unambiguous authority to the contrary" that informs the Court that the Court of Appeals of New Mexico lacks the ability or willingness to adjudicate Braverman's ADA claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1293 ("[W]hen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that

state procedures will provide an adequate remedy, in the absence of unambiguous authority to the contrary.")(quoting Pennzoil Co. v. Texaco Inc., 481 U.S. at 15).

Because the three Younger requirements are met, and there are no "extraordinary circumstances that render a state court unable to give [Braverman] a full and fair hearing on [her] federal claims," Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d at 711, the Court will most likely need to abstain.[12]   Further supporting the Court's conclusion that it may need to abstain under Younger v. Harris is the Tenth Circuit's decision in Sigg v. Dist. Court of Allen Cnty., 253 F.App'x 746 (10th Cir. 2007), where the Tenth Circuit found no reversible error when the district court applied Younger abstention to a federal case alleging conspiracy to deprive the plaintiff of property without due process of law in a state court divorce proceeding.  See 253 F.App'x at 747-48.

### B.     THE COURT MAY NOT BE ABLE TO STAY OR TO ENJOIN THE STATE COURT PROCEEDING UNDER THE ANTI-INJUNCTION ACT.

Braverman requests that the Court (i) prohibit the State Defendants from taking any action that would have the effect of transferring Braverman's assets to Goldstein, "including without limitation, the entry of any order or decree purporting to implement" the Order Adopting Special Master Report No. 6; (ii) prohibit LPL Financial from transferring any of Braverman's assets to Goldstein or without Braverman's consent; and (iii) affirmatively directing LPL Financial to

---

[12]The Court may address abstention under Younger v. Harris sua sponte, see Belloti v. Baird, 428 U.S. at 143 n.10, and dismiss without prejudice, see Taylor v. Jaquez, 126 F.3d at 1298 ("Our conclusion that Younger abstention applies ends the matter.  It was unnecessary for the district court to couch dismissal on the additional ground of the preclusive effect of the state court judgment."); Morrow v. Winslow, 94 F.3d at 1389 (remanding with instructions to abstain and dismiss the case without prejudice).  In this case, however, the State Defendants have filed a Motion to Dismiss, and the Court will reserve judgment on whether abstention under Younger v. Harris applies such that the Complaint should be dismissed until the parties have fully briefed and argued the issue.  See State Defendants' Motion to Dismiss, filed October 3, 2011 (Doc. 12).

immediately return to Braverman's name and control all assets in the secondary IRA.  See Motion for TRO at 1-2.  Braverman argues that Title II of the ADA "expressly authorizes" such an injunction and, as such, falls within an exception to the Anti-Injunction Act.  The State Defendants assert that nothing in the ADA invokes the Anti-Injunction Act and that Congress did not say, in the ADA, whether the Anti-Injunction Act would apply to prevent a federal court from issuing an injunction for a state court judge in an ongoing proceeding.  See Tr. at 35:4-36:1 (Fuqua).

The Anti-Injunction Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283.  The Act "imposes an absolute ban upon the issuance of a federal injunction against a pending state court proceeding in the absence of one of the recognized exceptions."  Mitchum v. Foster, 407 U.S. at 228-29.  See Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. at 286. The Anti-Injunction Act's basic purpose is to "prevent needless friction between state and federal courts," Mitchum v. Foster, 407 U.S. 225, 231 (1972), and to "preserve the independence of state judicial systems," Brooks v. Barbour Energy Corp., 804 F.2d 1144, 1146 (10th Cir. 1986)(citing Commodity Futures Tradign Comm'n v. Chilcott Portfolio Mgmt., 713 F.2d 1477, 1484 n.5 (10th Cir. 1983)).  "Thus, in determining whether an injunction should issue, a court should resolve all doubts against issuing the injunction . . . and narrowly construe the Act's three exceptions."  Brooks v. Barbour Energy Corp., 804 F.2d at 1146 (citing Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 630 (1977);  Mitchum v. Foster, 407 U.S. at 228-29; Atl. Coast Line R. Co. v. Bhd of Locomotive Eng'rs, 398 U.S. at 287; Alton Box Bd. Co. v. Espirit De. Corp., 682 F.2d 1267, 1271 (9th Cir. 1982)).  Furthermore, "[i]t is settled that the prohibition of § 2283 cannot be evaded

by addressing the order to the parties or prohibiting utilization of the results of a completed state proceeding." Steinmetz v. Steinmetz, No. 08-629, 2008 WL 5991009, at *7 (D.N.M. Aug. 27, 2008)(Browning, J.)(quoting Atl. Coast Line R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. at 287).

Under the "expressly authorized" exception that Braverman invokes, there is no requirement that Congress specifically mention § 2283; rather, statutory language permitting federal court injunctions to issue against state court proceedings can create an "expressly authorized" exception. Mitchum v. Foster, 407 U.S. at 237 ("[A] federal law need not expressly authorize an injunction of a state court proceeding to qualify as an exception . . . ."); Vendo Co. v. Lektro-Vend Corp., 433 U.S. at 633 ("[A]s Mitchum recognized, [express] language need not invariably be present . . . .") ; In re Parker, 499 F.3d 616, 626 (6th Cir. 2007)("[T]here is no requirement that Congress specifically mention § 2283 . . . ."). Where statutory language does not directly address the matter, courts should look for relevant legislative history which would support a conclusion that Congress expressly authorized the federal courts to enjoin state court proceedings. See Vendo Co. v. Lektro-Vend Corp., 433 U.S. at 633; Casa Marie, Inc. v. Superior Court of P.R., 988 F.2d 252, 261 (1st Cir. 1993)(looking to statutory language and legislative history to determine whether Congress expressly excepted the claims at issue from the Anti-Injunction Act); In re Parker, 499 F.3d at 626 ("Both the statutory language and the legislative history support our conclusion in the instant case.").

Braverman argues that § 12202 of Title II of the ADA expressly authorizes an injunction against state court proceedings. See Tr. at 29:3-10 (Boyle). Section 12202 states Congress' intent to abrogate state sovereign immunity under the Eleventh Amendment and that:

> In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

42 U.S.C. § 12202.  The plain language of § 12202 does not speak directly to whether a federal court may enjoin an ongoing state court proceeding.  Rather, section 12202's language seems to state that individuals suing a State under Title II of the ADA are not limited to prospective relief, as they would be in a suit brought under Ex Parte Young, 209 U.S. 123 (1908), and Edelman v. Jordan, 415 U.S. 651 (1974).  See Lussier v. Fla. Dep't of Highway Safety & Motor Vehicles, 972 F.Supp. 1412, 1419 (M.D. Fla. 1997)("It appears from both the statutory language and Eleventh Amendment jurisprudence that the second sentence of the statute is meant only to clarify the congressional intention that states be subject to both prospective and retrospective relief under the American with Disabilities Act.").

The Court found no legislative history that would support a conclusion that § 12202's language authorizes federal courts to enjoin state court proceedings.  Other courts have also reached this conclusion upon considering whether Title II of the ADA expressly authorizes federal courts to enjoin state proceedings. The United States District Court for the District of New Hampshire, in Goldblatt v. Geiger, No. 10-537, 2011 WL 1362119 (D.N.H. Mar. 8, 2011), assumed, without deciding that the Anti-Injunction Act would not bar the injunctive relief sought in that case.  See 2011 WL 1362119, at *9.  The District of New Hampshire noted, however,  that the plaintiffs had "pointed to no legislative history suggesting that Title II of the ADA falls within the 'expressly authorized' exception to the Anti-Injunction Act, and this Court can find none, or any other decision on point." Goldblatt v. Geiger, 2011 WL 1362119 at *9 n.1.  The District Court for the District of Massachusetts found that the Anti-Injunction Act would apply to bar the federal courts from intervening and that none of the three exceptions applied, despite the presence of an ADA claim. See Safe Haven Sober Houses, LLC v. City of Boston, 517 F.Supp.2d 557, 569 (D. Mass.

2007)(finding that no federal statute fits within the Anti-Injunction Act's exceptions where plaintiff brought an ADA claim).  The United States District Court for the Northern District of New York briefly mentions that courts have held that "express authorization exists in federal statutes such as ERISA, the Americans with Disabilities Act, and the Clayton Antitrust Act" in its decision that the Lanham Act does not fall within any exception, and cites to <u>Lussier v. Fla. Dep't of Highway Safety & Motor Vehicles</u>, 972 F.Supp. 1412, as the case which holds that the ADA falls within the expressly authorized exception to the Anti-Injunction Act.   <u>See</u> <u>Arby's Inc. v. B&R Mgmt. & Leasing Corp.</u>, No. 97-0845, 2000 WL 1335753, at *5 (N.D.N.Y Aug. 31, 2000).   <u>Lussier v. Fla. Dep't of Highway Safety & Motor Vehicles</u>, however, dealt with the Tax Injunction Act, and the Middle District of Florida held that "the legislative history is bereft of any evidence that would even suggest the Congress intended broader abrogation of the specific protections afforded to state governments from federal interference by the Tax Injunction Act."  972 F.Supp. at 1419.

        The Supreme Court in <u>Mitchum v. Foster</u> stated that "it is clear that, in order to qualify as an 'expressly authorized' exception to the anti-injunction statute, an Act of Congress must have created a specific and uniquely federal right or remedy, that could be frustrated if the federal court were not empowered to enjoin a state proceeding."  407 U.S. at 237.  Section 12202 states that a "State shall not be immune . . . from an action in <u>Federal or State</u> court of competent jurisdiction for a violation of this chapter."  42 U.S.C. § 12202 (emphasis added).  That Congress included language that a State is not immune in federal or state court suggests that state courts have concurrent jurisdiction over ADA claims.  Several federal courts have also determined that state courts have concurrent jurisdiction over ADA claims, including a district court within the Tenth Circuit.  <u>See</u> <u>Hapgood v. City of Warren</u>, 127 F.3d 490, 494 (6th Cir. 1997)("State courts have concurrent

jurisdiction over ADA claims."); Zatarain v. WDSU-Television, Inc., No. 95-30604, 1996 WL 97105, at * 3 (5th Cir. Feb. 7, 1996)("Zatarain concedes, as she must, that the Louisiana state courts have concurrent jurisdiction over Title VII and ADA claims . . . ."); Smith v. Latino, No. 08-504, 2009 WL 196200, at *3 (D.Utah Jan. 8, 2009)(Warner, J.)("Plaintiff has admitted that the [ADA] claims in this case were either brought or available in the Utah case."). State courts, like federal courts, have a constitutional obligation to safeguard personal liberties and uphold federal law. See Stone v. Powell, 428 U.S. 465, 494 n.35 (1976)(citing Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 341-44 (1816)). There is no evidence that the federal rights that Congress created in the ADA will be frustrated if federal courts are not empowered to enjoin state court proceedings or that the only way to effectuate the ADA's purposes will be to issue an injunction. See Mitchum v. Foster, 407 U.S. at 237-38.

Furthermore, "even if an exception to the [Anti-Injunction Act] applied, this is precisely the type of case where federal courts out of concerns of comity and the nature of our federal system properly refuse to exercise jurisdiction and intermeddle in the state court proceedings." See Horton v. Clark, 948 F.2d 1294, 1991 WL 240115, at *1 (10th Cir. 1991)(table)(unpublished opinion). "The fact that an injunction may issue under the Anti-Injunction Act does not mean that it must issue." Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 151 (1988)(emphasis original). See Zurich Am. Ins. Co. v. Superior Court, 326 F.3d 816, 824 (7th Cir. 2003)("[E]ven if the injunction is authorized by one of the exceptions, a district court must still determine whether an injunction is an appropriate exercise of its authority, . . . recognizing the respect due to the courts of a sovereign state . . . ."). This case involves a state court proceeding   and deals with issues that are of great importance to New Mexico: domestic relations and implementation of New Mexico court decisions.

Although Braverman contends that the allegations before this court are separate from issues of domestic relations, if the Court were to permanently enjoin the transference of the Secondary IRA, then the Court would effectively undo New Mexico's determination of how marital property should be divided.  Furthermore, New Mexico has a strong interest in effectuating its decisions through the entry of final decrees and orders, which Braverman asks the Court to suspend in this case.

Braverman seeks to enjoin proceedings pending the New Mexico courts.  The Anti-Injunction Act appears to apply and the ADA does not expressly authorize an exception to the bar on enjoining state court proceedings.  Braverman does not point to any other exception that might apply.  Braverman's remedy is to appeal the state court's decision to the Court of Appeals of New Mexico.  The Court, therefore, cannot and will not enjoin the state court proceeding.

### C.    JUDICIAL IMMUNITY PROBABLY PROTECTS SINGLETON AND HALL FROM A LAWSUIT UNDER THE ADA.

Braverman contends that none of the Defendants is entitled to immunity for their discrimination against her in violation of the ADA, because Congress abrogated Eleventh Amendment sovereign immunity, see Tennessee v. Lane, 541 U.S. 509, and the state court acted in the absence of any jurisdiction, see Motion for TRO ¶ 3, at 2.  The State Defendants argued that judicial immunity is one of three strong bases that the Court could choose to deny Braverman's motion.  See Tr. at 34:9-12 (Fuqua).  The State Defendants also asserted that the Eleventh Amendment immunity discussed in Tennessee v. Lane is separate and distinct from judicial immunity.  See Tr. at 40:4-6 (Fuqua).  The State Defendants pointed the Court to the Tenth Circuit case of Guttman v. Khalsa, which Braverman cites, where the Tenth Circuit upheld the application of judicial immunity while finding that Eleventh Amendment immunity is abrogated, and contend that judicial immunity is an absolute bar.  See Tr. at 40:6-16 (Fuqua).

In Guttman v. Khalsa, the Tenth Circuit found that absolute immunity barred ADA claims against a hearing officer and administrative prosecutor for the New Mexico Board of Medical Examiners, despite finding that the ADA abrogated the Eleventh Amendment immunity of the State of New Mexico.  See 446 F.3d at 1034, 1036.  The Tenth Circuit found that the hearing officer and administrative prosecutor were "acting in their quasi-judicial and prosecutorial functions," and that they were "entitled to absolute immunity from suit."  Guttman v. Khalsa, 446 F.3d at 1033.  Judge Singleton and Special Master Hall were acting in their judicial and quasi-judicial capacities, and are thus eligible for absolute judicial immunity.  Judge Singleton, as a state court judge presiding over a divorce proceeding, was acting in her judicial capacity at the time Braverman alleges Judge Singleton discriminated against her.  See Complaint ¶ 2, at 1.  Special Master Hall, as a duly appointed Special Master in the divorce proceeding, was acting in a quasi-judicial capacity at the time Braverman alleges Special Master Hall discriminated against her.  See Complaint ¶ 3, at 3. Special Master Hall participated in the deliberative process, holding evidentiary hearings, and issuing recommended findings of fact, and he exercised independent[13] judgment, issuing his conclusions of law and recommending an equitable division of marital assets.  See Duprey v. Twelfth Judicial Dist., 760 F.Supp.2d at 1205 ("Parks therefore does not need the protection of quasi-judicial immunity to assure that she is able to exercise independent judgment, unbiased and free from the pressure that potential civil liability might bring about.").  The Tenth Circuit in Guttman v. Khalsa noted that the "Supreme Court has long recognized that officials in administrative hearings can claim the absolute immunity that flows to judicial officers if they are

---

[13]Although Singleton had to review and adopt Special Master Hall's Findings and Conclusions for them to have effect, Special Master Hall exercised his own judgment in determining what those Findings and Conclusions were and how to equitably divide the marital assets.

acting in a quasi-judicial fashion." 446 F.3d at 1033.  In <u>Sigg v. Dist. Court of Allen Cnty.</u>, the

district court found that a state court special master was entitled to absolute immunity for his actions

in a state court divorce proceeding, and the Tenth Circuit affirmed, finding "no reversible error."

253 F.App'x at 747-48.

At the hearing, there was some discussion whether immunity would extend to Braverman's

requested injunctive relief.  <u>See</u> Tr. at 34:13-23 (Court, Fuqua).  The Tenth Circuit has previously

held that neither "judicial immunity nor the Eleventh Amendment would bar a suit against a judicial

officer for prospective injunctive relief." <u>DeYoung v. Kansas</u>, No. 95-3158, 69 F.3d 547, 1995 WL

662085, at *2 (10th Cir. Nov. 9, 1995)(table)(unpublished opinion)(citing <u>Pulliam v. Allen</u>, 466 U.S.

522, 541-42 (1984)).  The Tenth Circuit has recently held that "the doctrine of judicial immunity

now extends to suits against judges where a plaintiff seeks not only monetary relief, but injunctive

relief as well." <u>Lawrence v. Kuenhold</u>, 271 F.App'x 763, 766 n. 6 (10th Cir. 2008)(discussing how

the enactment of the Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, 110 Stat. 3847

(1996) "effectively reversed <u>Pulliam v. Allen</u>," the case on which the Tenth Circuit relied to limit

judicial immunity to injunctive relief). The only relief available to a person who sues a judge is

declaratory.  <u>See</u> <u>Lawrence v. Kuenhold</u>, 271 F.App'x at 766.

Braverman also argues that Judge Singleton and Special Master Hall lacked jurisdiction to

address and seize her out-of-state property such that they are not entitled to judicial immunity.

<u>See</u> Motion for TRO ¶ 3, at 2; Complaint ¶ 18, at 5.  Braverman argues that N.M.S.A. 1978, § 40-4-

4 does not provide state courts with jurisdiction over out-of-state property.  <u>See</u> Complaint ¶ 18, at

5. Section 40-4-4 grants state courts jurisdiction over "all property of the parties, wherever located

or situated in the state." N.M.S.A. 1978, § 40-4-4. The Court of Appeals of New Mexico, however,

has held that "a court may order a party to convey land in another state and it may enforce that decree by process against the owner."  Fenner v. Fenner, 106 N.M. 36, 39, 738 P.2d 908, 912 (Ct. App. 1987).  Although a court "may not directly affect title to out-of-state property," it may "order parties to act or to refrain from acting with regard to the property."  Fenner v. Fenner, 106 N.M. at 39, 738 P.2d at 912; Willis v. Willis, 104 N.M. 233, 234, 719 P.2d 811, 813 (1986).  Here, Judge Singleton and Special Master Hall merely ordered Braverman, LPL Financial, and Goldstein to take certain actions or refrain from taking certain actions with respect to the monies the state court ordered into the secondary IRA.  See Complaint ¶¶ 16-18, 4-5.  Neither Judge Singleton nor Special Master Hall  have transferred title to the secondary IRA; in fact, Braverman seeks to enjoin any order that would order the such a transfer.  See Motion for TRO at 1.  Even such an order, however, does not effect the title transfer that the Court of Appeals of New Mexico, in Fenner v. Fenner, indicated was prohibited.

Accordingly, the Court is likely to determine that judicial immunity protects Judge Singleton and that quasi-judicial immunity protects Special Master Hall.  If, therefore, the Court even gets to the merits, the Court will likely dismiss the claims against Judge Singleton and Special Master Hall.

> **D.    EVEN IF JUDICIAL IMMUNITY DOES NOT PROTECT JUDGE SINGLETON AND SPECIAL MASTER HALL, IT MAY BE THAT BRAVERMAN CANNOT SUE THEM IN THEIR INDIVIDUAL CAPACITY.**

The Court asked at the hearing whether individuals, rather than the state entity, could be sued under the ADA.  See Tr. at 32:9-16 (Court).  Braverman responded that she could sue individuals and that she believed "Tennessee v. Lane helps us with that because that's the [case where] the Court says prospective injunctive relief even against individuals is appropriate."  Tr. at 32:17-20 (Boyle).

-39-

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132 (emphasis added).  Title II's plain language would therefore suggest that officials may not be sued in their individual capacity.  Although the Tenth Circuit has not yet addressed whether Title II of the ADA permits plaintiffs to sue state officials in their individual capacities, several other circuits have held that ADA plaintiffs may not sue individuals in such a capacity.  See e.g., Badillo v. Thorpe, 158 F.App'x 208, 211 (11th Cir. 2005)("To the extent that Badillo seeks to hold Benefiel personally liable, there is no individual capacity under Title II of the ADA . . . ."); Carten v. Kent State Univ., 282 F.3d 391, 396-97 (6th Cir. 2002)(holding that a defendant must be held responsible in "his or her official capacity for violating Title II, which by its terms applies only to 'public entit[ies]'"); Garcia v. SUNY Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001)("Insofar as Garcia is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials."); Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1999)("[T]he commissioners may not be sued in their individual capacities directly under the provisions of Title II.  Title II provides disabled individuals redress for discrimination by a 'public entity.'").

To the extent that Braverman is suing Judge Singleton and Special Master Hall in their individual capacities, the Court will likely, it if even gets to the merits, dismiss such claims because Title II of the ADA does not provide for individual capacity suits against state officials.

**E.    IT IS UNLIKELY THAT BRAVERMAN WILL BE ABLE TO SHOW THAT THE STATE DEFENDANTS DISCRIMINATED AGAINST HER ON THE BASIS OF DISABILITY.**

Were the Court not prohibited from entertaining the case, the Court would still find that Braverman has not shown a strong likelihood of success on the merits.  The Tenth Circuit requires that a plaintiff prove three factors to establish a claim under Title II: (i) that he or she is a qualified individual with a disability; (ii) that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or the public entity otherwise discriminated against the plaintiff; and (iii) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.  See Gohier v. Enright, 186 F.3d at 1219.  There is no doubt that Braverman is an individual with a disability because of her bi-polar disorder.  See Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1081 (10th Cir. 1997)("[E]very appellate court which has considered the question has held or assumed that 'bipolar disorder' is a mental disability covered under the ADA . . . .  We agree.").  There is substantial doubt, however, whether the State Defendants discriminated against Braverman because of her disability.

Braverman asserts that there is no explanation, other than discrimination based on disability, why the divorce proceeding has not gone her way, and for the references to her bi-polar disorder in Special Master Hall's findings and conclusions.  See Tr. at 19:4-11 (Boyle)("The point of this is that the only explanation for this [kind] of strange behavior is a conclusion that the district court and Mr. [Lees] and the others involved in this conspiracy did no because they misunderstood Ms. Braverman's bipolar disorder . . . .").  See also Complaint ¶¶ 44-45, at 12-13.  It is unsurprising that Special Master Hall's findings and conclusions would include references to Braverman's bi-polar disorder, however, because Braverman admits that she asked for special consideration based on her

disability.  See Complaint ¶ 40, at 11 ("Plaintiff anticipated she that would not be represented by counsel at the deposition and therefore requested that her attorney-in-fact be permitted to attend to provide the support and protection she needed to cope with her disability during the deposition."). At the hearing, it was suggested, and Braverman did not deny, that she introduced the issue of her bi-polar disorder; that she argued that, as a consequence of her bi-polar disorder, she needed special consideration; and that she received such consideration.  See Tr. at 42:22-44:19 (Lees).

Examination of Special Master Hall's findings and conclusions, which Braverman highlighted and submitted at the hearing, further bolster the Court's conclusion that Braverman has not shown a likelihood of success on the merits.  Special Master Hall references Braverman's bi-polar disorder three times.  See Findings and Conclusions ¶¶ 9, 11, 87, at 3, 18.  In paragraph 9, Special Master Hall notes: "Petitioner suffers from bi-polar disorder.  On occasion, Petitioner acted out in a hostile manner toward her family members."  See Findings and Conclusions ¶ 9 at 3. Braverman contends that such conduct is a by-product of her bi-polar disorder.  See Tr. at 20:12-14 (Boyle).  While ordinarily such factors may not be relevant, in a contentious divorce proceeding or when dealing with claims of domestic violence, such information could provide important background or explain party behavior.  In paragraph 11, Special Master Hall states: "On some occasions [Braverman] separated from Respondent and consulted with attorneys. . . .  Respondent viewed these episodes as more the result of Petitioner's psychological disorders rather than true dissatisfaction with the marriage."  Findings and Conclusions ¶ 11, at 3.  Here, Special Master Hall is stating only that Goldstein viewed some of his separations from Braverman as a result of her bi-polar disorder, such information is certainly relevant when relating the facts leading up to the proceeding, and Special Master Hall does not appear to draw any conclusions about the validity of

-42-

this view.  Although Braverman contends that paragraph 11 demonstrates that "they don't get bi-polar disorder" and that "it doesn't affect Ms. Braverman's ability to manage her funds or do any of the other things they claimed to be concerned about," there is nothing in this finding of fact that reflects any belief that Braverman could not manage her money.  See Tr. at 20:21-21:2 (Boyle).  That Special Master Hall refers to bi-polar disorder as a psychological disorder is not proof of animus; rather, the reference demonstrates only that Special Master Hall is unfamiliar with the terminology used to describe bi-polar disorder.  Finally, in paragraph 87, Special Master Hall states: "Due to her physical and psychological condition and her training and experience, [Braverman] is not capable of holding employment." Findings and Conclusions ¶ 87, at 18.  Future earnings are an important consideration when dividing assets in a divorce proceeding or determining spousal support; here, Special Master Hall uses Braverman's bi-polar disorder as one of several factors which contribute to her likelihood of future employment.  See N.M.S.A. 1978, § 40-4-7E ("When making determinations concerning spousal support . . . the court shall consider . . . the current and future earnings and the earning capacity of the respective spouses.").  Certainly, a disorder characterized by unpredictable shifts in emotions and mood would effect Braverman's employment opportunities.[14]

Braverman also relies heavily on the fact that a nude photograph was used at various stages of the litigation.  See Complaint ¶¶ 35-39, 41-43, at 9-12.  Almost all of the uses of the photograph of which Braverman complains, however, were by Goldstein's counsel.  See e.g. Complaint ¶ 35-36,

---

[14]Bi-polar disorder is a serious mental illness in which common emotions become intensely and often unpredictably magnified.  Individuals with bi-polar disorder can quickly swing from extremes of happiness, energy, and clarity to sadness, fatigue, and confusion.  See Bipolar Disorder, American Psychological Association, http://www.apa.org/topics/bipolar/index.aspx (last visited October 12, 2011).

at 9-10 ("On or about July 23, 2010, Lees displayed the photograph during settlement negotiations with Plaintiff and her attorney-in-fact. . . . Lees subsequently transmitted the photograph in interstate commerce . . ."). Braverman alleges: "On information and belief, Singleton allowed Lees to remain in the case on account of Plaintiff's bi-polar disorder." Complaint ¶ 37, at 10. The previous sentence, however belies this accusation, as Braverman admits that Judge Singleton found "Lees' actions were highly inappropriate" even though she concluded that she did not have the power to remove Lees from the case. Complaint ¶ 37, at 10. Braverman also alleges that Judge Singleton and Special Master Hall discriminated against her "by refusing to stop Lees' use of the photograph." Complaint ¶ 38, 10. It is not readily apparent to the Court, however, that the photograph is irrelevant to divorce proceedings, because the photograph appears to depict Braverman using some sort of drug. See Photograph (Plaintiff's Ex. 2).

Braverman asks the Court to infer discrimination from a series of legal decisions in the divorce proceeding the state court determined in Goldstein's. The evidence that Braverman offers in support of her claim of discrimination does not demonstrate anything other than speculation and does not satisfy the strong showing of likelihood of success on the merits that the Tenth Circuit requires for a disfavored injunction. See Westar Energy, Inc. v. Lake, 552 F.3d at 1224.

IV.     **BRAVERMAN HAS NOT SHOWN THAT THE THREATENED INJURY TO HERSELF OUTWEIGHS ANY HARM THE PROPOSED INJUNCTION MAY CAUSE OTHER PARTIES.**

Braverman has not shown that it would be more equitable or not harmful to deprive Goldstein of the state court judgment he has obtained in the state court proceedings. See Steinmetz v. Steinmetz, 2008 WL 5991009, at *9. Braverman asserts that Goldstein will not be harmed, because if the Court issues a TRO, it will maintain the status quo. See Motion for TRO ¶ 8, at 4.

-44-

If, however, the Court prevents the transfer, then Goldstein will not have access to the funds to which the state court determined he is entitled and will face some of the same losses that Braverman alleges she suffered from the seizure of her assets.  See Motion for TRO ¶ 6, at 3 ("Plaintiff has already lost hundreds of thousands of dollars in her investment accounts as a result of Singleton's, and Hall's seizure and control of the Secondary IRA held by LPL.").

## V.   BRAVERMAN HAS NOT SHOWN THAT THE INJUNCTION WOULD NOT BE CONTRARY TO THE PUBLIC INTEREST.

Braverman asks to have the federal courts interfere in an ongoing domestic relations proceeding concerning the division of property resulting from a petition for divorce.  The Supreme Court has held, however,

> [t]he whole subject of domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States. . . . Thus, while rare instances arise in which it is necessary to answer a substantial federal question that transcends or exists apart from the family law issue, in general it is appropriate for the federal courts to leave delicate issues of domestic relations to the state courts.

Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12-13 (2004)(citations omitted)(internal quotations omitted).  Accord Hunt v. Lamb, 427 F.3d 725, 727 (10th Cir. 2005).  New Mexico's strong state interest in domestic relations is a powerful policy consideration that indicates that the public interest would weigh against federal court intervention in those matters by granting injunctive relief.  Moreover, because Braverman's request for an injunction does not fall within an exception to the Anti-Injunction Act, it would be inappropriate, and comity between the state and federal system would be unbalanced were the Court to issue an injunction.

**IT IS ORDERED** that the Plaintiff's Motion for Temporary Restraining Order and Brief in Support, filed September 16, 2011 (Doc. 2), is denied.

-45-

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Gary W. Boyle
Santa Fe, New Mexico

  *Attorney for the Plaintiff*

Gary K. King
 Attorney General of New Mexico
Scott Fuqua
 Assistant Attorney General
Santa Fe, New Mexico

  *Attorneys for the Defendants State of New Mexico, Judge Sarah Singleton, and Special*
   *Master James Hall*

Richard S. Lees
Richard S. Lees P.A.
Santa Fe, New Mexico

  *Attorney for Alan Goldstein*

Ross Crown
Lewis and Roca, LLP
Albuquerque, New Mexico

  *Attorney for Defendant LPL Financial Corporation*

-46-